THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN FITZTHUM, Appellant.

(Argued January 19, 1893; decided February 28, 1893.)

APPEAL from judgment of the Superior Court of the city of Buffalo, entered upon a verdict convicting defendant of the crime of murder in the first degree.

The following is the opinion in full :

"The defendant Fitzthum was convicted at the Criminal Term of the Superior Court of the city of Buffalo, held in May, 1892, of the crime of murder in the first degree. It is undisputed that Fitzthum killed John Roehrl, Jr., by stabbing him with a knife, on the evening of April 7, 1892. The defense was justifiable homicide, and it was also claimed that if the defendant was criminally liable, he was not guilty of murder in the first degree. Fitzthum was a butcher by trade, thirty-two years old, married, and, with his wife and three young children, occupied, at the time of the homicide, apartments in a house on Sycamore street,

Buffalo, consisting of a living room and bedroom.   One Meyer boarded with him.   Fitzthum had occupied these rooms for about ten days prior to the homicide.   Back of the Fitzthum rooms were similar rooms occupied by the Roehrl family, consisting of John Roehrl, Sr., his wife, his son John (the deceased), about twenty years of age, and two younger sons. The rooms of Fitzthum and Roehrl communicated with each other by a door in the partition dividing them.   The living room of the Roehrl family was about ten by thirteen feet.   In that room and near the door opening into the Fitzthum room was a sink and a faucet, and both families obtained water there.   It seems that Mrs. Roehrl rented both sets of rooms from the owner of the premises and afterwards sublet to Fitzthum the rooms occupied by him.   Both families were Germans and ignorant people of very low type.   Fitzthum came to this country about five years before the homicide, leaving his family in Germany.   He became acquainted with the Roehrls.   Mrs. Roehrl on several occasions left her husband and lived in adultery with Fitzthum.   This had occasioned quarrels between the husband and Fitzthum, and on one occasion Fitzthum had been arrested, fined and imprisoned for an assault upon Roehrl.   About a year prior to the homicide, Fitzthum's wife came from Germany and joined her husband. Fitzthum took the rooms in Sycamore street upon the solicitation of Mrs. Roehrl, her husband consenting, and was to pay part of the rent which Mrs. Roehrl had undertaken to pay for the whole premises.

"The question whether the admitted homicide was murder or a lesser grade of offense, or was justified, as claimed in behalf of the defendant, was presented to the jury upon conflicting evidence, and the ascertainment of the circumstances attending the killing was embarrassed by the fact that the evidence of the principal witnesses was often confused and was taken through interpreters, who had difficulty themselves in understanding the witnesses.

"There were two witnesses present at the homicide sworn in behalf of the People, namely John Roehrl, the father of the deceased, and Mrs. Roehrl, the mother.   The defendant testified in his own behalf, and his wife, and the boarder Meyer,

who were in the Fitzthum rooms at the time of the homicide, were examined as witnesses for the defendant.

"It appears that Roehrl the father, and the deceased, came home about six o'clock on the evening in question. "Fitzthum and Meyers also returned from their work at about the same time. Shortly after six o'clock one Tonczyk, who collected the rents of the house, came to collect the rent for the rooms leased by Mrs. Roehrl, and went into the part of the house occupied by her. Fitzthum, as he testifies, saw Tonczyk go into Mrs. Roehrl's apartments. He came out and entered the rooms of the defendant and an altercation immediately arose between Tonczyk and the defendant, the defendant claiming that he did not rent the rooms of him and he ordered Tonczyk out of the house, and seized a hatchet and went towards him and then seized him by the throat. During the melee Mr. Roehrl and his son John came through the door from their room into the rooms of Fitzthum, apparently to assist Tonczyk, and having released him the three went into the Roehrl rooms and closed the door. The collector soon left.

"The evidence as to the subsequent occurrences is involved in great conflict. The story related by Roehrl, the father of the deceased, is substantially this : he says, that he was sitting near the table and his wife near the stove and the deceased near the lounge when Fitzthum opened the door between the rooms, and came into the Roehrl rooms, and commenced complaining about the collector coming to him for the rent, and also commenced using vile epithets about Roehrl's wife ; that the son John interposed, asserting that his mother was not such a person as Fitzthum represented and ordered him out of the room ; that Fitzthum called him a 'laus bub' and said 'you son of a bitch you couldn't put me out ;' that he then stepped back quickly into his room, seized a knife from the table, and came back again, and advanced to the deceased who was then standing near his mother, and raising his hand, in which he held the knife over his head, struck his son with it, who immediately fell dead with his head towards the door between the rooms and about two feet therefrom. The mother corroborated her husband in some particulars, although she did not, as she testifies, see the blow with the knife, her back being towards the

parties at the moment. But she states that she saw her son fall, and Fitzthum in the door just as he was leaving the room. The husband testified that the deceased did not attack Fitzthum, that neither himself nor his son had any weapon or club at any time. The only evidence in the testimony of Roehrl of any struggle between any of the parties on that occasion is contained in his recital of the circumstances on the cross-examination. The witness was asked to describe the occurrence from the time Fitzthum came into the room, and the record is as follows: 'A. The first thing was as he entered he walked into the room and asked, he says, 'Did you rent this?' He wanted to know 'Did you rent this or the other son of a bitch?' Q. Tell him to go on? A. She said 'Yes, I have rented it to you, but you must pay it to the man.' He says, he wont pay him any rent, nor the son of a bitch either, and if he comes again he will kill him. He says if that were done it would be no more than they have claimed all along that he would get, that he would meet with that result. He turned round and tried to pull him out of the door. Q. Who did? A. He says his wife; after she tried to put him out of the door he then turned around and walked out on his own accord.' Roehrl testified that after the stabbing Fitzthum laid the knife on the table again and said: 'I give you enough, that it will be satisfactory.' On the floor of the Roehrl room, near the door, the blood marked where young Roehrl fell, and it is conceded 'that the body of young Roehrl must have fallen at the place of the stain.' The *post mortem* disclosed that the knife entered the body one and one-half inches below and one inch to the inner side of the left nipple, and cut through between the fifth and sixth costal cartilages, penetrating both cavities of the heart and reaching its posterior wall. There was also two incised scalp wounds, one from above the right ear to the top of the head, and one running in the other direction. The knife with which the wounds were inflicted was a carving knife used in the defendant's family, with a blade five inches long and about an inch wide. It was found after the arrest of Fitzthum on a chest in his bedroom, covered with clothing and having blood stains upon it. Fitzthum's wife testified that after the affray she took it from the table and placed it where it was found.

"The story of the occurrence told by Fitzthum is very different from that of Roehrl. He testified (in substance) that when he got home that night he heard his wife and Mrs. Roehrl scolding each other, each being in her own part of the house and the door closed. He testifies to the affray between himself and Tonczyk as has been related. He states that after the collector left he sat down by the table in his room and used the knife in cutting some meat for cooking; that he directed his wife to get a pitcher of water, but she said she was afraid to; that he then took the pitcher and went into the Roehrl room and filled his pitcher, and some vile conversation took place, and that 'Johnny grabbed him under the lounge and said 'You Dutch son of a bitch I have got it for you for some time;' that he got back into his room and put the pitcher of water on the table and with the other hand tried to shut the door, but it was pushed open by Mr. Roehrl and the deceased, who were armed, one with a club and the other with a piece of iron, and immmediately they came into the room and attacked him, the son striking him with a club over the shoulder, and the other hitting him on the wrist with the iron; that he reached for something and his hand touched the knife and he seized it, but that 'he dont know what he done with it, that he dont know whether he struck with it, or shoved it, or fell with it;' that he finally threw the knife down and tried to shove the Roehrls out of the room, and got hold of the door and shut it, pushing them into their room; that he then got a chair and put under the door knob, and sat down at the table and there remained until he was arrested; that he heard no one fall in the Roehrl room, and did not know that he had killed the deceased till after his arrest. His person was examined a few days after he was arrested and a bruise was found on his left shoulder and also on his wrist. Fitzthum's wife corroborated her husband as to the Roehrls coming into his room with weapons in their hands and as to the affray there, but she testified that she did not see her husband take the knife. Meyer was in the Fitzthum room. He testified to the Roehrls coming in and thought they had something in their hands, but did not see what they had, and the fighting commenced; that he saw Fitzthum pick up the

knife, but did not know whether he used it; that he did not see Fitzthum get a pitcher of water. He testified that Fitzthum, after he came back with the knife and laid it on the table, said: 'I think he give me a rest now; I give him a good one.'

"There is a large mass of evidence by these and other witnesses bearing upon the relations of the parties and tending to impeach and impair the credibility of the witnesses on the one side or the other. It would not serve any useful purpose to refer to the evidence in great detail. The object of the reference made is to show that a question was presented for the determination of the jury as to the character of the homicide, whether it was a murder accompanied by the element of deliberation and premeditation, or was a lesser degree of homicide, or whether, as was claimed, the homicide was justified by the right of self defense.

"It is conceded that the defendant caused the death and used the knife taken by him from the table, and inflicted therewith the fatal wound. It is also conceded that the deceased was in the Roehrl room when he fell. It is very difficult to believe that a wound which would ordinarily produce instantaneous death, could have been inflicted at the time the defendant leaves it to be inferred it was inflicted. This involves the necessity of believing that after the heart was cut through the deceased continued to resist the effort of Fitzthum to expel him from the Fitzthum room, and that he did not fall until he and his father had been shoved into their room and the door shut. The jury had the witnesses before them. The relation of the transaction by Roehrl is subject to much criticism. But it was for the jury to reconcile the discordant evidence and to accept or reject the testimony of the witnesses on either side, when contradictory, as the truth seemed to them to require. The violent character of the defendant appears from his own evidence. The statement which he made on the morning after the homicide, and which was reduced to writing, and signed by him, makes no reference to any attack upon him by the Roehrls such as he testified to on the trial. The witness Meyer had been twice convicted of larceny and the jury may well have hesitated to place much reliance upon his story.

"Upon a careful and anxious examination of the evidence we are unable to say that there is legal ground for disturbing the conclusion reached by the jury, and we cannot reverse a verdict in a capital case on the facts unless we are of opinion that the facts were not fairly considered, or that they did not justify the verdict.   Much stress is laid by counsel on the fact that the direction of the wound indicated that it could only have been inflicted by an ascending blow, where the hand in which the knife was held was below the point where it entered the body.   It is said that Roehrl speaks only of one blow given by the defendant from above downward.   Roehrl testified that he could not say whether more than one stroke was made with the knife or not.   But concededly the deceased was killed by a stab given by Fitzthum.   The scalp wounds would indicate more than one stroke of the knife.   Whether their existence confirms the theory of the counsel for the defendant, that the wounds were given during a struggle and fight between the Roehrls and Fitzthum, was for the consideration of the jury.

"The court admitted evidence under exceptions by the counsel for the defendant, that possibly the wound on the wrist of Fitzthum might have been caused by the handcuffs.   The judge, on the request of the defendant's counsel, charged that there was no evidence of any resistence or struggle at the time the defendant was handcuffed.   Considering the exception in connection with the charge we think no error was committed injurious to the defendant.   The court in its main charge, after having explained to the jury the different degrees of murder and manslaughter, remarked that ' if, as the defendant's counsel claims, the defendant should be found guilty of manslaughter in the first degree, it would be under the second subdivision of the statute, because,' etc.   At the conclusion of the charge the defendant's counsel excepted to the statement that the defendant's counsel ' claims that the defendant should be convicted of manslaughter in the first degree.'   The court immediately said ' no such charge has been made or intended. The jury will understand the court has made no such charge.' It is very obvious that the court in the charge was referring simply to the contingency that the jury might not find in

favor of the defense of justifiable homicide, and to the claim that in that event the case was not one of murder, but of manslaughter.  The court in the charge referred to the claim of self-defense as the 'one on which the defendant relies for an acquittal.'  This exception furnishes no reason for a new trial. The court charged that 'if the jury are satisfied from the testimony of the People under the law as I have called your attention to it, that the defendant is guilty,' etc.  There was no exception to this part of the charge, but it is now claimed that the jury were permitted to determine the guilt, not on the whole evidence, but on the evidence given on the part of the prosecution alone.  This is a clear misconstruction.  The judge was explicit in charging the jury that 'if the People have not satisfied you from all the evidence in the case' of the guilt of the defendant they should acquit.  The words in the clause excepted to, 'testimony of the People,' had reference to the whole case made by the People, including the testimony on the part both of the prosecution and defense.

"The error of the court in stating the testimony of Mrs. Roehrl was immaterial and evidently so regarded by counsel, who did not call attention to it on the trial.

"The court was asked to charge in regard to the manner in which the jury should regard the testimony of Meyer and Fitzthum, in view of the proof that they had been convicted of offenses.  The judge said the request was involved and he did not understand it.  The defendant's counsel then proceeded to state his request to charge in somewhat different language and the court charged as requested.  We perceive no error in the course taken by the court.  The defendant's counsel calls attention to an error of the court in quoting the testimony of Fitzthum, 'that I looked for something and grabbed the knife and helped myself with it.'  The criticism seems to be that Fitzthum stated that he seized the knife involuntarily.  The attention of the court was not called to any error in stating the testimony, and in the outset he reminded the jury that they were to correct any misapprehensions of the testimony by the court.  The evidence as recited does not vary substantially from the testimony given.

"There was no error in the refusal to charge that if the

evidence of the Roehrls did not account for the scalp wounds they were not accounted for except upon the theory of the defense, that they were received in a fight. The court replied, 'it could not charge the theories of counsel.' There was no specific evidence as to the infliction of the scalp wounds, and the evidence of neither party showed how or when they were inflicted.

"We have laboriously gone through with the case on the facts and upon the exceptions, and we find no error of law or fact which entitles the defendant to a reversal of the judgment.

"The judgment should be affirmed."

*William E. Kisselberg, Jr.*, for appellant.

*Daniel F. Kenefick* for respondent.

ANDREWS, Ch. J., reads for affirmance.
All concur.
Judgment affirmed.